HONORABLE RICHARD A. JONES

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| THE MANN LAW GROUP, et al., | |
| Plaintiffs, | CASE NO. C13-59RAJ |
| v. | ORDER |
| DIGI-NET TECHNOLOGIES, INC., et al., | |
| Defendants. | |

## I. INTRODUCTION

This matter comes before the court on a motion to dismiss from Defendant Velaro, Inc. and a motion to dismiss from Defendant Robert Parker. No one requested oral argument, and the court finds oral argument unnecessary. For the reasons stated below, the court GRANTS both motions to dismiss (Dkt. ## 8, 16), declines to grant Plaintiffs leave to amend their complaint, and directs the clerk to TERMINATE Velaro and Mr. Parker as parties in this action.

## II. BACKGROUND

The court begins its discussion by describing the facts as Plaintiffs allege them in their complaint. That distinction is important here, because much of the argument Plaintiffs make in opposition to these motions to dismiss depends on assertions that appear nowhere in their complaint.

ORDER – 1

1    Plaintiffs are two lawyers and their respective firms: The Mann Law Group,
2 Phillip Mann, The Whitaker Law Group, and John Whitaker. In 2008, they entered a
3 Contingent Fee Agreement with Digi-Net Technologies, Inc. ("Digi-Net"). Digi-Net held
4 the right to enforce United States Patent No. 6,912,563 (the "Patent"). Plaintiffs agreed
5 to represent Digi-Net in efforts to enforce the Patent by either negotiating license
6 agreements or pursuing patent infringement lawsuits. Digi-Net agreed to pay Plaintiffs'
7 expenses and a contingent fee equal to (for purposes of these motions) 37% of the fruits
8 of any license agreement, verdict, settlement, or other enforcement effort. According to
9 the complaint, the Contingent Fee Agreement contains a clause requiring arbitration of
10 "[a]ny disputes concerning this Agreement, Attorneys' fees or that relate in any way to
11 Attorneys' representation of Digi-Net . . . ." Compl. ¶ 4.4.8. Plaintiffs did not attach the
12 Contingent Fee Agreement to their complaint.

13    Velaro was among the targets of the Patent enforcement campaign. Digi-Net
14 ultimately sued Velaro. The lawsuit ended in a settlement. As part of that settlement,
15 Digi-Net and Velaro entered into a licensing agreement ("First License Agreement") in
16 January 2010. The First License Agreement required Velaro to make an initial payment
17 of $85,000 and pay a 2% biannual royalty on licensed products thereafter. The First
18 License Agreement required all payments, including the biannual royalty payments, to be
19 made to the Mann Law Group's client trust account. There is no allegation that the First
20 License Agreement disclosed the contingent fee arrangement to Velaro. There is also no
21 allegation that the First License Agreement required any Plaintiff to approve
22 modifications that Digi-Net and Velaro might make. Plaintiffs did not attach the First
23 License Agreement to their complaint.

24    Velaro made the initial payment and two royalty payments covering the first and
25 second half of 2010. Velaro made the payments to the designated client trust fund, and

ORDER – 2

Plaintiffs and Digi-Net apparently split these payments in accordance with the Contingent Fee Agreement.

By May 2011, Velaro's counsel contacted Plaintiffs (in their role as Digi-Net's counsel) to suggest modifying the First License Agreement to eliminate ongoing royalties in favor of a final lump-sum payment. Plaintiffs advised Digi-Net that the lump-sum payment Velaro offered was much too low, and Digi-Net signaled its agreement. When Plaintiffs asked in June 2011 if Digi-Net wanted to make a counteroffer, Digi-Net declined, claiming that the parties were too far apart to negotiate.

Not long thereafter, Digi-Net and Velaro negotiated an agreement without informing Plaintiffs. According to Plaintiffs, those negotiations culminated in an August 2011 agreement (the "Second License Agreement") that replaced the First License Agreement. The Second License Agreement required Velaro to make two payments. The first would be a royalty payment, in accordance with the First License Agreement, covering the first half of 2011. The second would be a lump sum payment of approximately $130,000. If another entity were to acquire Velaro in the future, Velaro agreed to make an additional payment capped at $300,000. Velaro was to make the royalty payment for the first half of 2011 to the client trust account, as designated in the First License Agreement. Velaro was to make all other payments in accordance with the Second License Agreement directly to Digi-Net.

In August 2011, Velaro made the royalty payment for the first half of 2011 to the client trust account. According to Plaintiffs, "[b]y causing [the royalty payment] to be transferred into the client trust account, defendants represented to [Plaintiffs] that the [First License Agreement] remained in effect." Compl. ¶ 4.25.2. The complaint contains no specific allegation as to what Velaro or anyone else told Plaintiffs in connection with the August 2011 payment.

ORDER – 3

When no one paid the expected royalty payment for the second half of 2011 to the client trust account, Plaintiffs began to make inquiries. By April 2012, they had learned of the Second License Agreement and its terms.

The complaint is silent as to whether Digi-Net ever paid Plaintiffs a contingent fee after receiving the $130,000 lump sum payment. The complaint is also silent as to whether anyone acquired Velaro or whether Velaro made a post-acquisition payment to Digi-Net. Instead, the principal complaint Plaintiffs raise is that they were deprived of "the amount of the 37% [contingent] fee that would have been paid from the future recovery under the [First License Agreement]." Compl. ¶ 4.27. They also contend that they were "deprived of the opportunity to enforce their rights under the Contingent Fee Agreement and the [First License Agreement] at a time before Digi-Net spent the money received as a result of the [Second License Agreement]." Compl. ¶ 4.28.

Plaintiffs sued Digi-Net, but the motions before the court question only Plaintiffs' decision to name Velaro and Mr. Parker, who is Digi-Net's CEO, as Defendants. Plaintiffs allege that Velaro tortiously interfered with a contract between Plaintiffs and Digi-Net, that Velaro breached the First License Agreement, and that both Velaro and Mr. Parker are liable for fraudulent misrepresentation. Mr. Parker and Velaro have moved to dismiss these claims. The court now considers their motions.

### III.  ANALYSIS

Velaro and Mr. Parker invoke Fed. R. Civ. P. 12(b)(6),[1] which permits a court to dismiss a complaint for failure to state a claim. The rule requires the court to assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from its allegations. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). The plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007). If the plaintiff succeeds, the

---

[1] Mr. Parker, who resides in Georgia, also contends that the court lacks personal jurisdiction over him. In light of the court's disposition today, it does not reach that issue.

ORDER – 4

complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief. *Id.* at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). The court typically cannot consider evidence beyond the four corners of the complaint, although it may rely on a document to which the complaint refers if the document is central to the party's claims and its authenticity is not in question. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). The court may also consider evidence subject to judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

### A.     Plaintiffs Have No Plausible Breach of Contract Claim Against Velaro.

The court begins its analysis at Plaintiffs' claim that Velaro is liable to it for breach of the First License Agreement. In Plaintiffs' view, they are the third-party beneficiaries of that Agreement, with standing to enforce it. They are mistaken as a matter of contract law. No one disputes that Plaintiffs are not parties to the First License Agreement. They are also not third-party beneficiaries of that Agreement, because in Washington, "both contracting parties must intend that a third-party beneficiary contract be created." *Postlewait Constr. v. Great Am. Ins. Co.*, 720 P.2d 805, 806 (Wash. 1986). In particular, the circumstances must demonstrate that the promisor intended to assume a direct obligation to the purported third party beneficiary. *Londale v. Chesterfield*, 662 P.2d 385, 389-90 (Wash. 1983) (observing that a mere desire or purpose to confer a benefit on a third party is insufficient). The court divines the parties' intent by looking to the terms of the contract and the circumstances under which it was made. *Postlewait*, 720 P.2d at 806. As the court has noted, Plaintiffs did not attach the First License Agreement to their complaint. Nothing in the complaint suggests that either the terms of the Agreement or the circumstances under which it was made support a conclusion that

ORDER – 5

Plaintiffs were third-party beneficiaries. In particular, nothing supports the conclusion that Velaro (who was the promisor with respect to the agreement to make payments) intended to assume a direct obligation to Plaintiffs. Velaro helpfully included the First License Agreement as an exhibit to its motion to dismiss, and Plaintiffs did not question its authenticity. The court's review of the Agreement confirms that it does not confer third party beneficiary status on Plaintiffs. For these reasons, Plaintiffs have no claim against Velaro for breach of the First License Agreement. For the same reasons, their request for declaratory judgment as to Velaro's breach of that agreement is also invalid.

**B.    Plaintiffs Have No Plausible Tortious Interference Claim Against Velaro.**

The only contract in which Plaintiffs have enforceable rights is the Contingent Fee Agreement. They claim that Velaro is liable for intentional interference with that contract. To succeed on that claim, they must prove five elements:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Leingang v. Pierce County Medical Bureau*, 930 P.2d 288, 300 (Wash. 1997). Plaintiffs have adequately pleaded a valid contractual relationship (their contractual right to be paid a contingent fee) and, for purposes of this motion, the court assumes that they have adequately pleaded that Velaro knew of that relationship. That assumption is dubious. There is no allegation in the complaint that would make it plausible to conclude that Velaro was aware of Digi-Net's obligations to Plaintiffs via the Contingent Fee Agreement. There were circumstances that may have suggested to Velaro that Digi-Net's relationship with Plaintiffs was changing. For example, Plaintiffs were not part of the negotiation of the Second License Agreement. In addition, whereas the First License Agreement required payments to the client trust account, the Second License Agreement required a final periodic royalty payment to the client trust account, with the final lump-

ORDER – 6

sum payment (and any lump-sum payment based on a future acquisition) to be made directly to Digi-Net.  It exceeds the bounds of plausibility, however, to infer from those allegations that Velaro knew that Digi-Net intended to breach any arrangement with Plaintiffs.  Nonetheless, the court will assume that Velaro's knowledge for purposes of today's decision.[2]

Even the most generous reading of Plaintiffs' complaint, however, does not permit the conclusion that Velaro did anything that induced or caused a breach of the Contingent Fee Agreement.  It is plausible to conclude that Digi-Net intended to breach that Agreement, but Velaro's only plausible motivation was to negotiate a license agreement on terms that were favorable to it.  If Digi-Net breached the Contingent Fee Agreement, it did so when it received the lump-sum payment pursuant to the Second License Agreement and paid Plaintiffs nothing.  Velaro may have facilitated that act by sending the payment directly to Digi-Net, but the cause of the breach was Digi-Net's decision not to pay Plaintiffs.  Velaro cannot be held responsible for that decision.

Although Plaintiffs' inability to plausibly allege that Velaro's conduct was the cause of any breach of the Contingent Fee Agreement is a sufficient reason to dismiss their interference claim, the court also notes that there are no plausible allegations that Velaro had an improper purpose or used improper means.  An improper purpose in the context of a tortious interference claim is the "improper objective of harming the plaintiff . . . ."  *Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989).  As the court has just explained, it is implausible to conclude that Velaro was responsible for harming the Plaintiffs.  At most, it is plausible to conclude that Velaro was aware that Digi-Net intended to harm Plaintiffs.  But even if Digi-Net had explicitly disclosed to Velaro that it

---

[2] Part of the reason for the court's assumption is that Plaintiffs used their opposition to Velaro's motion to dismiss to provide email correspondence between Velaro and Digi-Net during the negotiation of the Second License Agreement.  Ruiz Decl. (Dkt. # 13), Exs. B & C.  The emails, unlike the complaint, provide a basis to conclude that Velaro was aware of Digi-Net's obligation to pay Plaintiffs.

ORDER – 7

intended to breach the Contingent Fee Agreement by not paying Plaintiffs, Velaro's mere knowledge of Digi-Net's improper purpose does not demonstrate that Velaro had an improper purpose.

Putting their failure to allege Velaro's improper purpose aside, Plaintiffs have also failed to allege any improper means that Velaro used.  The complaint establishes only that Velaro renegotiated its obligations to Digi-Net.  There is nothing improper about that.  Plaintiffs claim that Velaro acted improperly by sending the final periodic royalty payment to the client trust account without revealing the Second License Agreement. Plaintiffs have not, however, established that Velaro had any duty to tell it anything about its agreements with Digi-Net.  Absent that duty, Velaro's failure to inform Plaintiffs about the Second License Agreement is not improper.  There is also nothing improper about Velaro's decision to send subsequent license payments directly to Digi-Net.  The First License Agreement expressly permits Digi-Net to designate itself or any other party to receive payments and notices.  Nothing in the Agreement prohibited Digi-Net, much less Velaro, from designating Digi-Net as the recipient of payments.

### C. Plaintiffs Have No Plausible Fraud Claim Against Velaro.

The court now turns to Plaintiffs' fraudulent misrepresentation claim.  Because that claim depends on proving fraud, it is subject to Federal Rule of Civil Procedure 9(b), which requires a plaintiff pleading fraud to "state with particularity the circumstances constituting fraud or mistake."  Plaintiffs' fraud claim, however, fails even under the more lenient standards of Rule 12(b)(6).  To explain why, the court begins by examining what the complaint says (and does not say) about the alleged fraud, keeping in mind that a claim of fraud requires, among other things, a false statement, the plaintiff's reliance on that statement, and damages as a result of that reliance.  *Guarino v. Interactive Objects, Inc.*, 86 P.3d 1175, 1191 (Wash. Ct. App. 2004).

ORDER – 8

Plaintiffs' complaint itself does not adequately allege a false statement; it alleges a fraudulent omission, and an implausible one at that. As the complaint explains, "[b]y causing [the final periodic royalty payment] to be transferred into the trust account, defendants represented to [Plaintiffs] that the [First License Agreement] remained in effect." Compl. ¶ 4.25.2. There is no allegation that Velaro affirmatively represented that the First License Agreement remained in effect. It simply omitted to state otherwise. Plaintiffs appear to recognize as much, explaining that Velaro's statement "had the purpose and effect of concealing the [Second License Agreement]" from Plaintiffs. Compl. ¶4.25.1.

Unlike a fraud claim based on an affirmative misrepresentation, a fraud claim based on a fraudulent omission requires that the person making the omission have a duty to the plaintiff to disclose what she has omitted. *Crisman v. Crisman*, 931 P.2d 163, 166 (Wash. Ct. App. 1997). There is no plausible allegation that Velaro had a duty to disclose to Plaintiffs that it and Digi-Net had entered the Second License Agreement.

Whereas the complaint is silent as to what Velaro actually said when it made the final periodic royalty payment, Plaintiffs used their opposition to the motion to dismiss to attach an August 22, 2011 letter from Velaro to Plaintiffs. In relevant part, the letter stated as follows:

> On August 22, 2011 Velaro Inc. transferred a total of $20,432.11 to the Mann Law Group Client Trust Group pursuant to the license agreement between Velaro, Inc. and Digi-Net Technologies. This royalty is representative of all Velaro products which fall under the terms of this license agreement for sales between January 1, 2011 and June 30, 2011.

Ruiz Decl. (Dkt. # 13), Ex. E. These statements appear nowhere in the complaint. Putting that aside, the statements are not false. No one disputes that the royalty Velaro paid was what the First License Agreement required for the first half of 2011. That Velaro and Digi-Net had abrogated the First License Agreement does not make it inaccurate to state that the payment Velaro enclosed with this letter was "pursuant to the

ORDER – 9

license agreement . . . ." The payment for the first half of 2011 in accordance with the First License Agreement was, by design, identical to the initial payment Velaro was to make under the Second Licensing Agreement.

Even if the complaint adequately alleged a false statement from Velaro, it does not adequately allege damages resulting from Plaintiffs' reliance on that statement. This is so for two reasons. First, Plaintiffs' belief that they are entitled to the royalties they would have received if the First License Agreement had remained in place is mistaken. Second, Plaintiffs have pointed to no damages occasioned by their reliance on Velaro's supposed false statements as to the continued existence of the First License Agreement.

Despite Plaintiffs' belief to the contrary, nothing prohibited Digi-Net from reaching a new license agreement with Velaro. Plaintiffs were entitled to 37% of the proceeds of any license agreement; they were not entitled to any particular license agreement. Digi-Net, their client, retained full control over the terms of its licenses. Plaintiffs' assertions to the contrary ignore not only Digi-Net had neither a contractual obligation nor any other duty to obtain Plaintiffs' approval before modifying a license agreement, but that any such agreement would seem to violate the Washington Rules of Professional Conduct. Those Rules make the client alone the master of the terms of a settlement agreement. RPC 1.2(a) ("A lawyer shall abide by a client's decision whether to settle a matter.") In addition, whereas the Rules permit a lawyer to contract for a contingent fee, RPC 1.5(c), they prohibit a lawyer from otherwise "acquir[ing] a proprietary interest in [a] cause of action or subject matter of litigation . . . ." RPC 1.8(h). Plaintiffs' insistence that they had the right to approve or reject Digi-Net's license decisions would seem to convert them from Digi-Net's attorneys to its business partners. The court doubts the law permits that result. Digi-Net's sole obligation to Plaintiffs was to pay them the agreed-upon contingent fee based upon whatever settlement or license agreement it entered. There are plausible allegations that Digi-Net breached that

ORDER – 10

agreement and thereby damaged Plaintiffs. There are no plausible allegations that Plaintiffs had a right to force Digi-Net to adhere to the First License Agreement instead of renegotiating it. The court dismisses all of Plaintiffs' claims to the extent they rely on a demand to the royalties Plaintiffs would have received if Digi-Net had not terminated the First License Agreement.

Even if Plaintiffs' claim to the royalties it would have received from the First License Agreement were valid, that claim does not arise from Plaintiffs' reliance on whatever allegedly false statements appeared in Velaro's August 22, 2011 letter. For that reason, they are not damages arising from fraud.

The complaint attempts to advance an alternate explanation of how Plaintiffs' reliance on Velaro's allegedly false statements in the August 22, 2011 letter damaged them. Because Plaintiffs relied on the allegedly implied statement that the First License Agreement remained in effect, they "delay[ed] asserting their right to full payment under the Contingent Fee Agreement." Compl. ¶ 4.25.5.[3] What is missing is an explanation of how the delay damaged them. Plaintiffs contend that they were "deprived of the opportunity to enforce their rights under the Contingent Fee Agreement and the [First License Agreement] at a time before Digi-Net spent the money received as a result of the [Second License Agreement]." Compl. ¶ 4.28. That assertion could at least serve as the seed of a fraudulent scheme. If Digi-Net and Velaro conspired not merely to delay Plaintiffs from discovering the Second License Agreement, but to permit Digi-Net to spend the lump-payment it received from the Second License Agreement, leaving Plaintiffs with no recourse to recover their contingent fee, then somebody arguably committed fraud. But the complaint falls well short of fleshing out this theory. It does

---

[3] In their opposition to Velaro's motion to dismiss, Plaintiffs articulated another theory of damage. They contend that the alleged misrepresentation as to the continued existence of the First License Agreement "precluded their timely inquiry into the fairness of the deal," *i.e.*, the Second License Agreement. Pltfs.' Opp'n (Dkt. # 11) at 3. As the court has already explained, Plaintiffs had no right to decide whether the deal was fair. Digi-Net was free to renegotiate the First License Agreement as it saw fit.

ORDER – 11

not allege that Digi-Net actually spent the lump-sum payment. It does not allege that spending the payment left Digi-Net financially incapable of paying Plaintiffs their contingent fee. Plaintiffs have not plausibly alleged that any false statement associated with Velaro's August 2011 payment caused them damage.

Plaintiffs could perhaps amend their complaint to include allegations that Digi-Net spent the proceeds of the large royalty payment that Velaro made,[4] thereby leaving Plaintiffs with no means of collecting their contingent fee, but that amendment would not save their fraud claim. The cause of that damage was not any misrepresentation as to the continued existence of the First License Agreement, it was Digi-Net's later decision not to pay Plaintiffs their contingent fee. Even if Plaintiffs could plausibly argue that Velaro's 2011 payment impliedly represented that the First License Agreement remained in effect, it did not impliedly represent that Velaro would continue to make payments to the client trust fund, or that Digi-Net would continue to adhere to the Contingent Fee Agreement. Digi-Net's obligation to pay Plaintiffs 37% of the proceeds of the large royalty payment did not arise until Digi-Net received that payment, which was after August 2011. Put another way, even if Velaro had disclosed in August 2011 that the First License Agreement had been terminated and that the lump-sum payment that the Second License Agreement required would go directly to Digi-Net, Plaintiffs would have had no recourse but to await the lump-sum payment and demand their contingent fee from Digi-Net. In short, Velaro is not liable, on a fraud claim or otherwise, for Digi-Net's failure to pay Plaintiffs in accordance with the Contingent Fee Agreement.

**D.     Plaintiffs Have No Plausible Fraud Claim Against Mr. Parker.**

The court next considers whether Plaintiffs' fraud claim fares any better when asserted against Mr. Parker. Unlike Velaro, Mr. Parker at least arguably had a duty to

---

[4] In their opposition to Mr. Parker's motion to dismiss, Plaintiffs included a December 2012 email from Mr. Parker to them in which he suggests that Digi-Net was in a difficult financial position and was unable, at that time, to pay Plaintiffs. Smart Decl. (Dkt. # 19), Ex. H.

ORDER – 12

disclose to Plaintiffs the existence of the Second License Agreement, although it is not at all clear that he was obliged to do so at the time Velaro made its final biannual royalty payment in August 2011. There is no plausible allegation that Mr. Parker made any affirmative representation to Plaintiffs in connection with that payment. Assuming, for the sake of argument, that he made an actionable omission or representation in connection with the August 2011 payment, Plaintiffs' fraud claim still falls short. Again, there are no plausible allegations of damages arising from Mr. Parker's misrepresentations in August 2011. Plaintiffs' damages accrued when Digi-Net received the next payment from Velaro (of approximately $130,000) and Digi-Net declined to pay Velaro in accordance with the Contingent fee Agreement. Plaintiffs have not plausibly alleged damages arising from any delay occasioned by Mr. Parker's failure to reveal the existence of the Second License Agreement in August 2011.

### E.  Plaintiffs Have Not Properly Invoked Any Arbitration Clause.

Plaintiffs' complaint includes a conclusory request for "an order compelling arbitration of all claims against Digi-Net and Parker." Compl. ¶ 5.7. There are no allegations that Mr. Parker is party to any agreement to arbitrate. Moreover, Plaintiffs have taken no action to enforce any arbitration requirement. Rather than requesting that the court compel arbitration of its fraud claim against Mr. Parker, Plaintiffs chose to oppose Mr. Parker's motion to dismiss on its merits. The court need not decide, at this time, whether Plaintiffs have waived their right to arbitration. It suffices to conclude that Plaintiffs have not yet invoked any arbitration right, and thus nothing prevents the court from deciding Mr. Parker's motion to dismiss.

### F.  The Court Declines to Grant Leave to Amend.

Plaintiffs have requested leave to amend their complaint, but they have not explained how they would amend their complaint to state plausible claims against Velaro or Mr. Parker. The court acknowledges that an opportunity to amend would permit

ORDER – 13

Plaintiffs to cure several superficial defects, including their failure to allege plausibly that Velaro knew anything about the Contingent Fee Agreement or Digi-Net's intent to avoid paying Plaintiffs, their failure to allege adequately the content of the alleged misrepresentations Velaro or Mr. Parker made in connection with the August 2011 payment, and their failure to make adequate allegations that Digi-Net spent later royalty payments and is now unable to pay what it owes Plaintiffs. For all of the reasons the court has stated, however, these allegations would not salvage Plaintiffs' claims against Velaro or Mr. Parker. Plaintiffs have not demonstrated that they could amend their complaint to salvage those claims.

### IV.  CONCLUSION

For the reasons previously stated, the court GRANTS both motions to dismiss (Dkt. ## 8, 16), declines to grant Plaintiffs leave to amend their complaint, and directs the clerk to TERMINATE Velaro and Mr. Parker as parties in this action.

DATED this 15th day of July, 2013.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 14